SNUGGERY-ELVIS PARTNERSHIP, NIKI J. TRANAKOS, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SNUGGERY-ELVIS PARTNERSHIP, GEORGE A. FRITZ,[2] A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Snuggery-Elvis Partnership
Docket Nos. 28282-88, 20362-89
United States Tax Court
T.C. Memo 1992-622; 1992 Tax Ct. Memo LEXIS 651; 64 T.C.M. (CCH) 1128; October 22, 1992, Filed *651 Appropriate orders will be issued denying petitioners' motion, and decisions will be entered for respondent. Niki J. Tranakos, pro se in docket No. 28282-88. For George A. Fritz in docket No. 20362-89: Harold Miller. [3]
For Respondent: John Sheffield, III. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: By Notice of Final Partnership Administrative Adjustment issued in each of the instant consolidated cases, [4] and pursuant to audit and litigation procedures of sections 6221-6233, respondent determined adjustments to the partnership items of the Snuggery-Elvis Partnership as follows: Basis of Property
Qualifying for
Investment Credit
Docket Number
Year
Losses Disallowed
Disallowed
28282-88
1983
$ 1,469,724
$ 10,000,000
1984
2,147,082
20362-89
1985
$1,950,077
1986
1,976,628
The issue for decision is whether the transaction involving the Snuggery-Elvis Partnership's purchase of *652 a master recording has economic substance. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts and certain exhibits have been stipulated for trial pursuant to Rule 91. By reference, we incorporate the stipulated facts in this Opinion. At the time they filed their petitions in the instant case, Niki J. Tranakos and George A. Fritz both maintained mailing addresses in Atlanta, Georgia. At the time such petitions were filed, the Snuggery-Elvis Partnership (the partnership) and its tax matters partner, The Snuggery, Inc., maintained mailing addresses in Atlanta, Georgia. At the time he filed the motion of the Snuggery, Inc., to intervene, Arthur Tranakos was acting as president of the Snuggery, Inc., and maintained a mailing address in Atlanta, Georgia. David Kent acquired the "right and title to the name and assets of Hayride, Inc., U.S.A.," which included the assets of "The Louisiana Hayride", a radio program. Among the assets of "The Louisiana Hayride" were recordings of Elvis Presley's performances. *653 Mr. Kent allegedly copied such recordings onto a magnetic tape known as a master recording. On August 4, 1980, Marshall Sehorn, Jerry C. Wilson, and Mr. Tranakos, as trustee for the Tranakos Grandchildren Trust, entered into an agreement [5] with Mr. Kent to purchase the master recording for $ 185,000. According to such agreement, in the event Mr. Sehorn, Mr. Wilson, and Mr. Tranakos, as trustee, decided to reproduce the master recording and sell the reproductions, Mr. Kent was entitled to a royalty of $ 1 for each reproduction. Mr. Kent sold his rights "with the express understanding of buyer that seller does not warrant to buyer any right to cause the Presley performances on this tape to be made into a tape phonograph record or records for commercial sale." The master recording was appraised on April 10, 1983, by *654 Jerry Wagoner. Mr. Wagoner's appraisal was admitted into evidence solely for the purpose of showing that Mr. Tranakos relied on it, not as an expert opinion of the value of the master recording. In his appraisal, Mr. Wagoner assigned a minimum market value of $ 10 million to the master recording. Mr. Wagoner's appraisal mentions several facts that he considered, such as Joel Whitburn's opinion in his book, "Top Pop Artist and Singles", that Elvis Presley is the number one "recording artist of all time"; RCA records, a division of RCA Corporation (RCA), was manufacturing the records; and that some of the songs on the master recording had not been available before. Mr. Wagoner based his appraisal on sales of 1 million units at $ 19.95. His appraisal stated, however, that substantial media exposure would be necessary to reach that level of sales. On June 1, 1983, RCA entered into a licensing agreement and two distribution agreements with Mr. Sehorn, Mr. Wilson, and Mr. Tranakos, as trustee, who in turn, on August 23, 1983, agreed to sell the master recording to The Snuggery, Inc., a Georgia corporation. Mr. Tranakos is the president of The Snuggery, Inc. On August 31, 1983, The *655 Snuggery, Inc., and 37 individuals or entities formed the partnership. The purpose of the partnership was to acquire the master recording from The Snuggery, Inc., and reproduce the master recording for retail sale. The Snuggery, Inc., retained a 70 percent interest in the partnership and the 37 individuals and entities purchased an interest in the remaining 30 percent of the partnership. Under the partnership agreement, The Snuggery, Inc., was designated as the managing partner. The Snuggery, Inc., assigned its right to purchase the master recording to the partnership. Under the partnership agreement, the partnership was required to make a cash downpayment of $ 100,000 and sign a promissory note to Mr. Sehorn, Mr. Wilson, and Mr. Tranakos, as trustee in the amount of $ 9.9 million. The first principal payment of $ 900,000 and all accrued interest was payable on or before December 31, 1984. Thereafter, beginning in 1985, a principal payment of $ 1 million and all accrued interest was payable on or before December 31 of each successive calendar year. The $ 9.9 million note between the partnership and Mr. Sehorn,Mr. Wilson, and Mr. Tranakos, as trustee, was not offered as evidence *656 at trial. No payment on the note were ever made. A "Synopsis of Elvis Presley Purchase Program" was prepared to promote the partnership. The synopsis includes the following information: PRODUCT: Elvis Presley Master Sound Recording CLIENTS: For People in 50% Tax Bracket Seeking Investment Opportunity 1. Master Sound Recording: The Snuggery, Inc. has obtained, by contract, the right to purchase an Elvis Presley Master which contract it will transfer to the The Snuggery-Elvis General Partnership. The partner-investors will acquire thirty (30%) percent interest in said partnership in consideration of a total contribution of $ 500,000.00 to the partnership. The Snuggery will retain seventy (70%) percent interest in the partnership. 2. Purchase Price: $ 10,000,000.00 for the Elvis Presley Master payable, $ 100,000.00 down with a ten-year note bearing interest of twelve (12%) percent annually, payable $ 900,000.00 plus interest on January 31, 1984, and $ 1,000,000.00 principal plus interest on each anniversary thereafter. 3. Amount and Use of Contribution: $ 5,000.00 contribution by the partnership for each .3 percent of the Partnership. The $ 500,000.00 expended: *657 $ 100,000.00 for purchase downpayment; $ 400,000.00 for promotion. 4. Tax Benefit for Each .3 Percent of Partnership Interest: 1983
1984-86
1987
Investment Tax Credit
$ 6,000.00
Depreciation
$ 4,275.00
$ 5,989.00
$ 6,270.00
Expenses
1,200.00
Total Each Year
$ 11,475.00
$ 5,989.00
$ 6,270.00
Total For All Years
$ 35,712.00
5. Economic Projection (For 30% Interest): Records
Profit
Investor
Price
Sold
Per Record
Profit
Direct Response:
Print Media
19.95
250,000
$ 3.00
$ 750,000.00
Television
19.95
250,000
2.00
500,000.00
Retail
9.95
100,000
.70
70,000.00
Foreign
500,000
.15
75,000.00
$ 1,395,000.00
6. Recording Distribution: The Partnership will enter into distribution agreement with Southlane Products Distributing, Inc. for five (5) years. 7. Manufacture and Foreign Sales: RCARecords has agreed to manufacture the records for sale to the public and to distribute the records in all markets outside North America. 8. Legal Documents: Prepared for the partnership by Arthur P. Tranakos, Attorney at Law (Tax Specialist), Suite 809, Anchor Savings Bank Building, 41 Marietta Street,N.W., *658 Atlanta, Georgia 30303.
Mr. Tranakos does not recall if the synopsis was actually used to promote the partnership. The materials used to promote the partnership, however, were similar to the synopsis. On January 26, 1984, Mr. Wilson, Mr. Sehorn, and Mr. Tranakos, as trustee, entered into a licensing and distribution agreement with JEM Records, Inc. In the agreement, JEM Records, Inc., acknowledged the prior agreement with RCA and agreed to utilize RCA in connection with the manufacturing of the records. The record contains one print advertisement designed to solicit orders for reproductions of the master recording by mail. No evidence was introduced at trial to establish that the advertisement was ever distributed to the public. The partnership filed a partnership return for taxable years 1983, 1984, 1985, and 1986. In taxable year 1983, the partnership reported a loss of $ 1,469,723.53, which included depreciation in the amount of $ 1,425,000 and expenses in the amount of $ 44,723.58. Also, in taxable year 1983, the partnership claimed property having a basis of $ 10 million as qualifying for investment credit. In taxable year 1984, the partnership reported a loss of $ 2,147,082.89, *659 which included total income of $ 45,209.73, interest expense in the amount of $ 11,967.20, depreciation in the amount of $ 2,090,000, and expenses in the amount of $ 90,325.42. In taxable year 1985, the partnership reported a loss in the amount of $ 1,950,077, which included total income of $ 126,817, interest expense in the amount of $ 3,147, depreciation in the amount of $ 1,995,000, and expenses in the amount of $ 78,747. In taxable year 1986, the partnership reported a loss in the amount of $ 1,976,628, which included a total income of $ 18,810,interest expense in the amount of $ 438, and depreciation in the amount of $ 1,995,000. On May 31, 1988, respondent issued a Notice of Final Partnership Administrative Adjustment covering the partnership's taxable years 1983 and 1984. On March 16, 1989, respondent issued a Notice of Final Partnership Administrative Adjustment covering the partnership's taxable years 1985 and 1986. OPINION Before resolving the substantive issue of the instant case, we address a motion filed by Mr. Tranakos after the trial to reopen the record in the instant case to submit additional documents and testimony. Mr. Tranakos contends that the record should *660 be reopened because he was incarcerated and, therefore, did not have access to the necessary records and because he had inadequate time to subpoena witnesses for trial. Respondent objects to the motion. For the reasons discussed below, we will deny the motion. Before setting forth our reasons for denying Mr. Tranakos' motion, a review of the procedural history of this case is instructive. On October 31, 1988, Niki Tranakos, a partner other than the tax matters partner, filed a petition for readjustment of partnership items for taxable years 1983 and 1984. Ms. Tranakos designated Atlanta, Georgia, as the location for the trial. On December 20, 1988, Ms. Tranakos identified The Snuggery, Inc., as the tax matters partner for the partnership. Ms. Tranakos is Mr. Tranakos' mother. On January 3, 1989, respondent filed the Answer in the instant case. On March 3, 1989, Ms. Tranakos was ordered to pay the filing fee for the instant case by April 3, 1989. Although the Court granted Ms. Tranakos' motion to extend the deadline for the filing fee until April 30, 1989, she failed to pay the filing fee. Consequently, on June 19, 1989, her case was dismissed for lack of jurisdiction. *661 The order dismissing the case, however, was set aside on July 11, 1989. On November 15, 1989, the Court issued a notice setting the instant case for trial on the Court's April 16, 1990, Trial Session in Atlanta, Georgia. On January 24, 1990, respondent filed a motion to compel production of documents. Respondent's motion stated that a letter, dated October 3, 1989, was sent to Ms. Tranakos, inviting her to a conference scheduled for November 28, 1989, at the Office of District Counsel and informally requesting that she bring various documents and a copy of the master recording to the conference. Ms. Tranakos failed to attend the conference, failed to furnish the requested documents, and failed to contact respondent to schedule another conference. On December 7, 1989, respondent served on Ms. Tranakos a request for production of documents and explained in an accompanying letter that she must produce the requested documents or respondent would request sanctions for a failure to respond. As of January 24, 1990, Ms. Tranakos had not provided respondent with any of the requested documents. On February 1, 1990, respondent filed a motion to compel responses to interrogatories and requested *662 sanctions for a failure to comply. Respondent's motion stated that, on December 7, 1989, respondent served Ms. Tranakos interrogatories with an accompanying letter stating that she had 45 days to respond to the interrogatories and that sanctions would be requested for a failure to respond. As of February 1, 1990, Ms. Tranakos had not answered any of the interrogatories. On February 7, 1990, this Court ordered Ms. Tranakos to produce the documents respondent had requested and file responses to respondent's interrogatories or file a response to respondent's motion to compel on or before March 2, 1990. The Court's Order stated that if petitioner did not fully comply, the Court would impose sanctions under Rule 104. On March 5, 1990, respondent informed the Court that Ms. Tranakos had neither produced the requested documents nor responded to the interrogatories. On April 10, 1990, respondent and Ms. Tranakos filed a joint motion for a continuance of the trial scheduled for April 16, 1990. The reason for the requested continuance was that Ms. Tranakos did not have any records because her son, Arthur Tranakos, was in possession of the necessary records but that he was incarcerated *663 and did not have access to such records. On April 13, 1990, this Court granted the continuance but ordered that on or before May 18, 1990, the parties were to make arrangements to have the records available and to conduct such interviews with Mr. Tranakos as the parties considered necessary. The Court also ordered that the parties be ready to proceed to trial in the fall term of the Court. On May 21, 1990, respondent filed a status report stating that, on March 27, 1990, the parties had met with Mr. Tranakos at the Atlanta Federal Penitentiary. During the meeting, Mr. Tranakos identified several possible locations of the records and stated that his son had access to such locations. Respondent also stated that, as of May 21, 1990, Ms. Tranakos had failed to respond to the requested discovery. The trial was not set for the fall term. On December 13, 1990, the Court issued a Notice of Trial setting the instant case for trial on May 13, 1991. On May 3, 1991, Ms. Tranakos made a motion for continuance of the trial scheduled for May 13, 1991. Ms. Tranakos stated that she was requesting a continuance because she did not have any records at that time. The motion was denied. At *664 the call of the calendar on May 13, 1991, the instant case was set for trial on May 22, 1991, and the Court ordered Ms. Tranakos to bring Mr. Tranakos to court on that day. Also, on May 13, 1991, Mr. Tranakos, as president of The Snuggery, Inc., filed a motion to intervene in all taxable years in issue and requested a continuance, alleging that Ms. Tranakos and Mr. Fritz were not diligently prosecuting the instant case, that they did not have the necessary records to prosecute the instant case, and that without a continuance, the nonpetitioning partners of the partnership would be prejudiced. On May 22, 1991, the Court granted Mr. Tranakos' motion to intervene and denied his motion for continuance. Mr. Tranakos' contention in his motion that he was not able to prepare for the trial of the instant case has a hollow ring. As Mr. Tranakos prepared the petition that his mother filed, he has known of the instant case since its inception. At the time the petition was filed, Mr. Tranakos was not incarcerated and could have gathered the necessary records. During Mr. Tranakos' incarceration, the Court ordered Mr. Miller and Ms. Tranakos to interview Mr. Tranakos and obtain the necessary *665 records from him. During a meeting at the penitentiary, Mr. Tranakos had informed his son of the location of the necessary records and led respondent's counsel and the other parties present to believe that his son could obtain the necessary records. No records, however, were produced, and Mr. Tranakos has not given any credible reason why the records could not be produced. At trial, Mr. Tranakos stated that he believed the records were located in Decatur, Georgia, but that on his furloughs from the penitentiary he did not have time to search through the boxes and file cabinets. If he knew where the boxes and file cabinets were, he could have easily pointed someone in the right direction to search the file cabinets and boxes for him. Mr. Tranakos has not presented the Court with any credible reason why someone else could not have searched through the file cabinets and boxes. The parties were ordered more than a year before the trial to gather the records and be prepared for trial. It was not until just before the scheduled trial session that the Court was apprised of any difficulty in preparing for trial. A motion to reopen the record will not be granted unless the evidence *666 to be presented was not available for use at the original trial or could not have been obtained with reasonable diligence. See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 332-333 (1971); Purex Corp. v. Procter & Gamble Co., 664 F.2d 1105, 1109 (9th Cir. 1981); Mayer v. Higgins, 208 F.2d 781, 783 (2d Cir. 1953); Glagola v. Commissioner, T.C. Memo. 1990-180. No such showing has been made in the instant case. To the contrary, the evidence Mr. Tranakos seeks to offer subsequent to trial was available at the time of the trial and clearly no reasonably diligent effort was made to obtain the evidence. Mr. Tranakos had numerous opportunities to obtain the documents or at least advise someone else where the documents were and have them search the boxes and file cabinets. No showing has been made that sufficient furlough time was not available to at least accomplish such action. Mr. Tranakos states that the witnesses he would have called were not contacted earlier because he did not have adequate time to subpoena them. Yet, he makes no credible *667 explanation why someone else could not have contacted such witnesses earlier. Two and one-half years elapsed between the time Mr. Tranakos prepared the petition in the instant case and the time of trial. Mr. Tranakos has not shown that, during such time, he cooperated in resolving the instant case. Consequently, Mr. Tranakos' motion to reopen the record will be denied. We next decide whether the transaction in which the partnership purchased the master recording has economic substance. Respondent contends that the transaction lacks economic substance and that the deductions and investment credit claimed with respect to such purchase should therefore be disallowed. Petitioners contend that they have proved that the partnership is entitled to such deductions and investment credit. Petitioners have the burden of proof. Rule 142(a). "A sham transaction is one which, though it may be proper in form, lacks economic substance beyond the creation of tax benefits." Karr v. Commissioner, 924 F.2d 1018, 1022-1023 (11th Cir. 1991) (citing Knetsch v. United States, 364 U.S. 361, 365-366 (1960); Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989)). *668 A transaction devoid of economic substance is not recognized for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). A transaction, however, that "is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached," will be respected for Federal income tax purposes. Frank Lyon Co. v. United States, supra at 583-584. In Rose v. Commissioner, 88 T.C. 386, 414 (1987), affd. 868 F.2d 851 (6th Cir. 1989), we adopted a unified test of economic substance. The unified approach of Rose is applicable in cases involving "generic tax shelters". Generic tax shelters possess characteristics which make tax motivation apparent. Rose v. Commissioner, supra at 412. Those characteristics are: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported *669 rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. Rose v. Commissioner, supra at 1023. In Karr v. Commissioner, supra, the Eleventh Circuit held that consideration of "characteristics of generic tax shelters to aid in identifying transactions in which tax motivation is apparent" is an appropriate starting point in deciding whether a transaction lacks economic substance. The Court stated that the focus of the analysis, however, must be "an examination of the substance of the transactions to determine whether those transactions had any practicable economic effect other than the creation of tax benefits." Karr v. Commissioner, supra at 1023 (fn. ref. omitted). The transaction in the instant case was a generic tax shelter. Rose v. Commissioner, supra. *670 The investors in the transaction accepted the terms of the purchase without negotiation. The rights to reproduce the master recording are difficult to value, and no evidence was offered at trial to establish that the master recording could be profitable. The master recording clearly appears to be overvalued. David Kent created the master recording by re-recording a taped radio show onto a magnetic tape, which was not an expensive or time consuming procedure. Of the consideration paid for the master recording, $ 9.9 million was allegedly in the form of a promissory note, and no evidence has been offered to prove that such note was recourse or that it even exists. Once tax motivation is apparent, we must consider whether a significant business purpose existed for the taxpayers to obtain the claimed benefits. Patin v. Commissioner, 88 T.C. 1086, 1116 (1987), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. *671 without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988); Rose v. Commissioner, supra at 412. Factors to be considered are whether arm's-length dealings existed, the extent of any investment activities, the structure of the financing, and the relationship between fair market value and price. Rybak v. Commissioner, 91 T.C. 524, 536-537 (1988); Patin v. Commissioner, supra at 1117-1124; Rose v. Commissioner, supra at 415-422. Although a taxpayer's subjective intent is a factor to be considered in deciding whether a transaction has economic substance, implicit in our analysis in Rose v. Commissioner, supra, is the "conclusion that a transaction that is found to lack economic substance under the approach there adopted is one in which objective factors preclude finding that the taxpayer had an actual and honest profit objective." McCrary v. Commissioner, 92 T.C. 827, 845 (1989). "A transaction that has a business purpose *672 or profit objective will survive the Rose analysis of economic substance." McCrary v. Commissioner, supra at 845. The absence of arm's-length negotiations is a key indicator that a transaction lacks economic substance. Rybak v. Commissioner, supra at 537; Rose v. Commissioner, supra at 416. Petitioners have failed to introduce any evidence that arm's-length negotiations occurred during the partnership's purchase of the master recording. To the contrary, Mr. Wilson, Mr. Sehorn, and Mr. Tranakos, as trustee, sold the master recording for $ 10 million to The Snuggery, Inc., a corporation of which Mr. Tranakos was president, after purchasing the rights to the recording from Mr. Kent for $ 185,000 plus a royalty of $ 1 for each recording reproduced. Under the agreement, the seller expressly caveated that the seller does not warrant any rights to make records from the master recording. Subsequently, the partnership was formed with 37 partners who paid $ 5,000 for a .3 percent interest in the partnership. The lack of arm's-length dealing is obvious from the foregoing. No evidence *673 was introduced to show that the investment in the master recording was made with any profit objective. Although distribution agreements were entered into evidence, the evidence does not show that any action required by such agreements was, in fact, undertaken. Mr. Tranakos testified about the number of records and tapes ordered from RCA, promotions and advertising, experts consulted, and sales figures, but no documents or other witnesses were offered to substantiate such testimony. Under the circumstances of the instant case, we do not accept Mr. Tranakos' self-serving testimony. Lakewood Manufacturing Co. v. Commissioner, 453 F.2d 451, 454 (6th Cir. 1972), affg. T.C. Memo. 1970-133; Tokarski v. Commissioner, 87 T.C. 74, 76 (1986). The purchase of the master was allegedly financed with a promissory note in the amount of $ 9.9 million. The presence of deferred debt that is in substance or in fact not likely to be paid is an indication that the transaction lacks economic substance. Rose v. Commissioner, 88 T.C. at 419. The note was not offered at trial, and *674 Mr. Tranakos failed to testify regarding the terms of the note or even its existence. Consequently, petitioners have failed to prove that the note existed and, even if it did exist, that it was likely to be paid. Finally, we consider the relationship between the fair market value of the master recording and the price paid by the partnership to acquire the master recording. As noted above in our findings of fact, although the record contains a copy of Mr. Wagoner's appraisal, such appraisal was not admitted for the purpose of establishing the fair market value of the master recording. Petitioners have offered no credible proof of the fair market value of the master recording. To the contrary, the evidence shows that the master recording was obviously overvalued. Consequently, we hold that petitioners have failed to prove that the fair market value of the master recording bears any relationship to the alleged $ 10 million purchase price. Based on the foregoing, we hold that petitioners have failed to prove that the transaction in issue possesses economic substance. Accordingly, respondent's disallowance of the losses and investment credit relating to the master recording is *675 sustained. To reflect the foregoing, Appropriate orders will be issued denying petitioners' motion, and decisions will be entered for respondent. Footnotes
1. Snuggery-Elvis Partnership's tax matters partner, The Snuggery, Inc., through its president, Arthur Tranakos, upon motion granted by the Court, has intervened in the instant cases. ↩
2. George A. Fritz conceded the instant case as to him and declined to participate in the trial.↩
3. When George A. Fritz conceded, Harold Miller's representation was withdrawn.↩
4. The Court, upon respondent's motion, consolidated the instant cases for trial, briefing, and opinion (hereinafter referred to as the instant case).↩
5. The use of the terms agreement, purchase, sell, and the like is for convenience only and is not intended to characterize legal relationships involved in the arrangement to which reference is made.↩