T.C. Memo. 2020-4

UNITED STATES TAX COURT

JASON HOMMEL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23155-14.                    Filed January 8, 2020.

Jason Hommel, pro se.

<u>Monica Cendejas</u> and <u>Erin Kathleen Salel</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Jason Hommel began running a coin business from his garage in 2009.  He was good at the business, and the business was good.  It soon outgrew his garage, and Hommel both bought an old coin shop in early 2009 and opened a new mint-and-coin shop later that fall.  But fortune varies, and by the

**[*2]** end of 2010 he had been charged with false imprisonment by his workers and had lost both businesses.

The Commissioner sent Mr. Hommel a notice of deficiency that said he owed more than a million dollars in tax for 2009 alone. Mr. Hommel says he shouldn't owe this much for 2009 because, in retrospect, he was far along the path to the ruin he suffered in 2010.

## FINDINGS OF FACT

Mr. Hommel is a California native. After graduating from the University of Colorado in Boulder, he managed a restaurant for just over a year before moving home to work with his father on precious-metals sales and analysis.[1] Mr. Hommel's father was a successful businessman, and the two "had a good four or five years" working and learning together before his death in 2004. That left Mr. Hommel a good inheritance, which he invested in silver- and gold-mining stocks. Sometime in the early 2000s Mr. Hommel established an online presence with a website called SilverStockReport.com. He and a partner figured out how to offer some features for paid subscribers, and the website became profitable.

---

[1] Mr. Hommel and his father were investors in silver and gold, and silver- and gold-mining stocks. When they started sometime in 1998 or 1999, neither had much experience in this market, but they quickly became adept.

**[*3]** Mr. Hommel's fortune was at its zenith when 2009 began. He received a distribution of about $100,000 after terminating the subscription services to his website, and decided to enter the business of silver-bullion trading. He started to make online sales out of his home through an auction site called seekbullion.com. He and a friend would prepare and ship the silver from Mr. Hommel's garage. Business was good, and Mr. Hommel was soon making around 30 sales a day.

## I. Coin Shops and Minting

Success led Mr. Hommel to expand. He convinced himself that he could both make and sell silver coins himself and that he could do it better than his competitors. By the fall of 2009 he had opened two coin shops and a mint. The businesses' products were good--and apparently in high demand--but unexpected troubles were about to strike.

### A. The Rocklin Coin Shop

Troubles began shortly after Mr. Hommel moved the business out of his garage and into the Rocklin Coin Shop. Rocklin was an existing business, and Mr. Hommel bought it on March 20, 2009 from Roger Firstenberger for $50,000.[2]

---

[2] According to Mr. Hommel, however, he paid more "outside of the bill of sale" including a tip of five "palladium bars" that were worth roughly $2,500 each. He said the total (including other unspecified consideration) was closer to $150,000.

[*4] He'd been one of Rocklin's "largest customers" before purchasing it, and Mr. Firstenberger thought Mr. Hommel "underst[oo]d the business very well." The shop came complete with a safe, a security system, show cases, and trade tools such as display counters and desks, but the sale did not include Rocklin's existing inventory. No problem--Mr. Hommel had his own inventory of about $1 million in gold and silver. With this he could stock Rocklin, which he chose to run as a sole proprietorship.

To prepare for Rocklin's opening, Mr. Hommel advertised on his website, brought his bullion in to fill the safe, and opened a separate bank account. He also hired MV and JR to be the comanagers of the shop.[3] MV was a banker and had reached out to Mr. Hommel in response to his newspaper advertisement for the job. JR was a family acquaintance whom Mr. Hommel really didn't know much about. Mr. Hommel, MV, and JR were all trained by Mr. Firstenberger in how to run the shop and how to buy and sell gold and silver from the public.

On April 1, 2009, Rocklin opened its doors to the public under its new management. Customers could buy bullion or coins either by cash or wire transfer, and half of all of Rocklin's sales were made in cash. Rocklin would buy

---

[3] We identify these men by their initials because Mr. Hommel's allegations of their misconduct could seriously harm their reputations if believed, and the truth of his allegations turns out not to be important in computing his tax bill.

[*5] its inventory from walk-in customers, as well as precious-metal refiners or other dealers. Mr. Hommel was at first a hands-on manager at Rocklin and was there about every day through June 2009.

But Mr. Hommel never intended to work at the shop on a regular basis. His personal life had become busier, and he wanted to open up a mint and write a book. This meant he needed to hire more help, so he brought on a friend of MV's and JR's, a man we'll call GN. Mr. Hommel added both MV and JR to Rocklin's bank account in June so that they "would be able to do [their] job[s]" without his being there. But he thought he needed to have someone at Rocklin's helm, and he made MV what he called "fiduciary manager" of the shop.

Mr. Hommel, however, seems to have wanted a paper trail that would lead any nosy people away from him. This led to an agreement on paper--where Mr. Hommel sold Rocklin to MV--as well as an oral agreement between the two. From Mr. Hommel's perspective, the oral agreement was as follows: "[MV] was the day-to-day manager of the shop, and by putting the shop in his name, [MV] would be the one responsible for filing all the taxes, and of the profits of the store * * * and [MV and Mr. Hommel] * * * had an oral a[greement] that [Mr. Hommel] would be paid the profits and [MV] could simply deduct that as advertising costs." Lawyers might at this point be concerned that the transaction might look like a

**[*6]** sham, but Mr. Hommel claimed to justify this recharacterization of profit as advertising costs in his own mind as being recompense for the publicity he brought Rocklin through his website.

Lawyers might also be concerned that such an oral agreement would leave Mr. Hommel vulnerable to assertions of the parol evidence rule and statute of frauds, because it was not at all what was put on paper. On paper Mr. Hommel simply sold Rocklin to MV. We have in the record a bill of sale dated September 1, 2009, and it looks like a markup of the one between Mr. Hommel and Mr. Firstenberger: Rocklin's lease was transferred into MV's name and MV received the "safe, security & alarm, office furniture, show cases, and the trade tools and investments," but no inventory. That doesn't mean Rocklin was transferred without any metal to sell. The same metal was in the store after the sale that was in it before; to the world it might look like Rocklin's inventory was the same, but by not mentioning it in the bill of sale, Mr. Hommel thought MV wouldn't "exactly own the inventory." One might think that this would cause problems as new metal and coins came in and old metal and coins were sold--the paperwork had nothing in it to govern the inevitable commingling of old and new inventory. But Mr. Hommel didn't think this would be a problem, because he believed that all the cash flowing into the store was also part of the inventory and thus belonged

[*7] to him.  Inventory (even if one limits it to the traditional definition of stock held for sale) is not a small item in a coin shop--at the time of the "sale" to MV, Rocklin's inventory was worth approximately $1 million.

As Mr. Hommel explained the deal, his simultaneous oral agreement with MV would undermine the written transaction:  According to the oral agreement, Mr. Hommel would continue to be the real owner of Rocklin and have the right to all its profits, while MV would get only a salary.  This oral agreement was meant to "set[] aside the bill of sale, and * * * [MV] was going to assume [a] fiduciary duty and [Mr. Hommel] would be the beneficiary of that duty * * * ."  The only money that changed hands, under either the written contract or the oral agreement, was about $55,000--which Mr. Hommel took from Rocklin and placed in an escrow account.  Mr. Hommel sincerely believed that he "retained full ownership of everything at all time[s] because [MV] never gave [him] any consideration to buy the store from [him]."

Mr. Hommel also explained that his plan was to have the three comanagers[4] run Rocklin and MV--as "fiduciary manager"--manage the books and records.

---

[4] According to Mr. Hommel, Rocklin did not have an employee payroll system because MV, JR, and GN were all "independent managers" or "independent contractors" who "ha[d] to make independent decisions and [have] negotiating abilit[ies] with the customer[s]."

**[*8]** MV was to update Mr. Hommel with a weekly report of inventory and sales. It will come as no surprise to those with a darker view of human nature that shortly after this transaction MV opened up a separate bank account for Rocklin in his name alone. September 2009 was also the last time a deposit was made into Mr. Hommel's original Rocklin account.

We are careful to note, at this point in our factfinding, that we also believe Mr. Hommel when he says that he did not consult with a lawyer, broker, or anyone else when he crafted this transaction.

B.    J.H. Mint

Mr. Hommel then turned his attention to opening a mint.[5] To forge this dream, he had leased a warehouse in Grass Valley, California "around January or February of 2009." He then "called around to determine how to build a mint" and was referred to International Rolling Mills (Rolling Mills), which makes minting machinery. He struck a deal with Rolling Mills to buy some silver-minting machines at about $300,000 each. Those machines arrived at the warehouse in June or July 2009. He then hired Tim Hronis, a building contractor, to be his

---

[5] Precious-metal ore must first be refined to remove impurities and produce a concentrate. The concentrate is then typically sent through a foundry, in which it is heated until molten and then cast. A mint transforms the shape and size of metal that has been refined, concentrated, and cast.

**[*9]** "building manager" and "manager of the minting machines," and to help him build J.H. Mint. Mr. Hommel again papered the transaction in an unusual way by perhaps putting the warehouse lease in Mr. Hronis' name.[6]

As the machines settled into the back of the warehouse, Mr. Hommel set up another coin shop in the front. His plan was to add to the usual coin-shop inventory newly minted silver "rounds"--noncurrency coins--stamped with his monogram, "J.H." Mr. Hommel intended for J.H. Mint's tradable coins to become as well-recognized in the trade as those he had ordered from other mints and sold at Rocklin. He thought that this bit of vertical integration would let him turn over his inventory more quickly and end the hassle of dealing with mints in which he had lost trust.

Mr. Hommel, however, needed someone to run the coin-shop side[7] of the business, so he hired DB--his shipping manager for seekbullion.com--to "be the public face" of J.H. Mint, and he put into place an arrangement with him that

---

[6] Mr. Hommel said that Mr. Hronis was the tenant, but then said he wasn't exactly sure whether Mr. Hronis held the J.H. Mint lease, or some other lease in his name.

[7] The coin shop was stocked with "$50,000 to $100,000" of cash either from Mr. Hommel's bank accounts or potentially from the first day of bullion sales since "you sell bullion to the public" and "boom, you've got $100,000"--at least on a good day.

**[*10]** mirrored his arrangement with MV at Rocklin. It would appear to the world that DB was doing business as J.H. Mint, but Mr. Hommel would be the true owner with the right to all of each month's inventory and profits. There was never a bill of sale, so J.H. Mint was never transferred into DB's name on paper, and no part of this arrangement was recorded.

The coin-shop side of J.H. Mint was a success--sometimes accruing extra cash which was deposited into Mr. Hommel's personal bank accounts. But he soon realized that the mint side was "a money pit disaster." In addition to DB and Mr. Hronis, there were four other individuals working for J.H. Mint. J.H. Mint was initially stocked with approximately 200,000 ounces of Mr. Hommel's silver, but 100,000 were used to cover repair expenses for the minting machines. With half of his inventory spent, he didn't have "enough inventory to fill the machines," and "[w]ithin a year [he] realized [he] should just shut down the machine part of it * * * ." J.H. Mint was unable to make more than 5,000 silver rounds during the time it was open.

Mr. Hommel did not register J.H. Mint as a business under California law and did not incorporate until November 2011, after he sought advice from an attorney. Neither did he open a separate bank account for J.H. Mint right away, and instead ran the trades through his personal bank account. He made this choice

[*11] because he was starting to get "a little skeptical" of DB and "was just scared of theft." Maybe he was right--DB at some point between J.H. Mint's opening and July 2010 opened a bank account for J.H. Mint in his own name.

C.    The 2010 Fallings Out

Mr. Hommel's Rocklin and J.H. Mint arrangements seemed to be running smoothly through 2009 and into early 2010. He continued to receive a monthly wire transfer into his personal account from Rocklin--payments which had started with Rocklin's opening in April and remained steady until the end of 2009. And while Mr. Hommel knew that the mint side of J.H. Mint was tanking, at least the coin-shop side had proved successful.

But in the summer of 2010 Rocklin and J.H. Mint "kind of went south together" when Mr. Hommel began to suspect that MV and DB were stealing. Mr. Hommel noticed in July that DB's weekly inventory reports were "regularly inaccurate," and "were showing significant declines, greater than you could possibly explain away with regular business activity," while DB's own bank account (d.b.a J.H. Mint) grew. In August 2010 Mr. Hommel decided to fire DB, but only after convincing him to transfer most of the money in DB's account over to a new "fiduciary manager." When all was said and done, Mr. Hommel believed

[*12] that DB had stolen $76,000 worth of inventory from J.H. Mint and converted it into cash.[8]

Things were even worse at Rocklin. Mr. Hommel was tipped off that something was awry when Mr. Firstenberger called him with word that MV and the other comanagers were "telling everybody that [Mr. Hommel's] not affiliated with the shop at all." After hearing this, Mr. Hommel conducted a "spot inventory check" at Rocklin--comparing his latest inventory report to a physical count--in September 2010 and found that the inventory was $288,000 short. According to Mr. Hommel, MV admitted that he had moved $350,000 worth of silver and gold offsite "in case [they] got robbed by the public." Mr. Hommel told MV that he was to bring it all back to the shop. He then decided to take matters into his own hands. The next day he drove to the shop and, after a heated exchange with JR and GN, removed all of the inventory from the vault--which by Mr. Hommel's count had a value of $160,000 less than it had had the day before.

---

[8] Mr. Hommel sued DB for "embezzlement, breach of fiduciary duty [and] * * * theft." DB cross-claimed against Mr. Hommel for "[d]efamation of character for calling him a thief." It's unclear whether this case settled, though Mr. Hommel's settlement with the Rocklin crew stated that "we will similarly seek to work towards * * * dropping * * * all claims against [DB]."

**[*13]** Mr. Hommel became quite upset, and decided to make what he called a "citizen's arrest" after he saw a post on Rocklin's website which read "we will be open with full inventory on Monday." He first went to the local police station, where he dropped off a document he called an "indictment." He then went to Rocklin carrying a gun, a chain, and a padlock and subsequently locked JR inside the store. But this attempt at a citizen's arrest and reclaiming any missing inventory was not received well by local law-enforcement officials. The police arrested him for false imprisonment. A grand jury indicted him, and two years later he was found guilty. A state court also issued a restraining order that barred him from going near the shop ever again.

Mr. Hommel hired an attorney after his arrest and sued all three Rocklin comanagers in Nevada County Superior Court for theft and embezzlement. MV, GN, and JR unsurprisingly took the position that the written deal was the real deal and cross-complained against Mr. Hommel for defamation of character, unlawful business practices (false advertising and unfair competition), breach of contract, and trespass, among other things. These cases settled in April 2012, with all claims dropped and neither party receiving any money. At no point during 2010 did Mr. Hommel file his 2009 tax return.

**[*14]** II.     Morgan Distribution

A completely unrelated issue is an unreported distribution of $336,000 from Morgan Stanley.  Mr. Hommel received this distribution from Morgan Stanley into his personal WestAmerica Bank account during 2009.  At trial he admitted that he failed to report this distribution on his return.

III.     Return, Audit, Notice, and Trial

A.     Audit and Bank Deposits Analysis

Mr. Hommel did not file his 2009 tax return until October 5, 2011, and the total tax shown on his 1040 was zero.  Here's a breakdown of what he reported on the Schedule C, Profit or Loss From Business ("Coin/Silver Dealer"), of his 2009 return:

| | |
|---|---|
| Gross receipts/other income | $1,122,216 |
| Cost of goods sold | 1,641,659 |
| Total expenses | 268,725 |
| Net loss | (788,168) |

The Commissioner began an audit.  During that audit Mr. Hommel did not provide any records of his gold and silver dealings.  He had not made or kept copies, and he claims that it was legally impossible to access any of his businesses' records for

**[*15]** 2009 because they "were the legal domain and purview of [MV] or [DB]" and because of the restraining order that barred him from Rocklin.

Because Mr. Hommel had not kept adequate records, the Commissioner conducted a bank-deposits analysis to reconstruct his income. The revenue agent analyzed five accounts that Mr. Hommel owned, and he concluded that there was just under $9.2 million in Schedule C gross receipts--which led the Commissioner to conclude that Mr. Hommel had failed to report nearly $8.1 million in income. Here's a summary:[9]

---

[9] We note that the summary is slightly different from the summary provided by the Commissioner. However, after we added up the deposits identified in the bank statements, we believe these are the correct totals.

| [*16]<br>Account | Persons with signatory authority | Date of last deposit included in BDA | Total deposits in 2009 | Ownership disputed? |
|---|---|---|---|---|
| WestAmerica Bank 964-1 ("Personal Account") | Hommel | 12/31/2009 | $7,615,239.55 | No |
| WestAmerica Bank 926-6 | Hommel | 4/7/2009 | 1,076,002.43 | No |
| Premierwest Bank 0237 ("Rocklin Account") | Hommel<br>MV<br>JR | 9/3/2009 | 1,248,743.38 | Yes, after 9/3/2009 |
| WestAmerica Bank 970-4 | Hommel<br>Hronis | 12/16/2009 | 327,000.00 | No |
| Bank of America 0180 | Hommel | 8/31/2009 | 177,411.43 | No |

The agent also reviewed all outgoing wire transfers, and he determined that Mr. Hommel had understated his cost of goods sold (COGS) by nearly $4.4 million. This was an adjustment much in Mr. Hommel's favor, and it meant that Mr. Hommel was entitled to COGS of more than $6 million.

B.    Notice and Trial

The Commissioner issued Mr. Hommel a notice of deficiency in June 2014. It showed a $1.2 million deficiency and also pressed on a late-filing addition to

[*17] tax and a section 6662(a)[10] penalty.  Mr. Hommel timely petitioned our Court.  In preparing for trial, the Commissioner assigned a different revenue agent, Yong Shin, to the case, and Agent Shin again reduced the amount of unreported taxable deposits that the IRS said that Mr. Hommel had made.  He reached this conclusion after excavating more nontaxable deposits that turned out to be wire transfers between Mr. Hommel's bank accounts.  Here's Agent Shin's summary:

| Account | Total 2009 deposits | Taxable deposits | Non-taxable deposits |
|---|---|---|---|
| WestAmerica Bank 964-1 ("Personal Account") | $7,615,239.18 | $6,958,329.14 | $656,910.04 |
| WestAmerica Bank 926-6 | 1,076,321.52 | -0- | 1,076,321.52 |
| Premierwest Bank 0237 ("Rocklin Account") | 1,248,743.38 | 1,020,031.88 | 228,711.50 |
| WestAmerica Bank 970-4 | 327,000.00 | 30,000.00 | 297,000.00 |
| Bank of America 0180 | 177,411.43 | -0- | 177,411.43 |
| Total | 10,444,716.00 | 8,008,361.00 | 2,436,354.00 |

[10] All section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

**[\*18]** This reduced the Commissioner's estimate of the total unreported deposits to $6,810,339.[11]

We tried this case in San Diego, California,[12] where we learned that Peter Ottinger, a CPA, prepared Mr. Hommel's 2009 tax return. Mr. Hommel didn't specify which documents he gave to Mr. Ottinger for this purpose and guessed that he may have used the (likely inaccurate) inventory reports that he had received from MV. Mr. Hommel testified that he and his CPA decided not to report any trades from Rocklin on his individual 2009 tax return, since MV now owned the shop.

Mr. Hommel "strongly disagree[d]" with the Commissioner's COGS determination, because it was derived only from bank records and did not include any of the businesses' cash transactions. Mr. Hommel did not, however, introduce any evidence to support this argument.

Although the Commissioner determined a section 6662(a) penalty for the year at issue, he failed to introduce at trial any evidence that he'd complied with

---

[11] We note here that this final computation of unreported deposits doesn't square perfectly with the information supporting the second bank-deposits analysis that is in the record. We find that the total amount of unreported deposits is what the Commissioner states in his brief: $6,810,339.

[12] Mr. Hommel lived in California at all relevant times, which means this case is appealable to the Ninth Circuit. See sec. 7482(b)(1)(A).

[*19] section 6751(b).  See Graev v. Commissioner, 149 T.C. 485, 493 n.14 (2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016).

## OPINION

Mr. Hommel claims that we should not attribute to him any of this unreported income discovered by the Commissioner because the ownership of Rocklin was in dispute after September 3, 2009, and because the coin shop's managers stole inventory during the year.  But the Commissioner says the store's ownership and any thefts after September 3, 2009, are irrelevant because he considered only deposits into Rocklin's bank account up until that date--the date when Rocklin was sold (at least on paper) to MV.

We address whether these deposits were income to Mr. Hommel for 2009. We'll also address the other adjustments that the Commissioner made, whether Mr. Hommel is liable for an addition to tax and a penalty, and whether we can grant any of his requests for affirmative relief.

I.    Underreported Income

The law usually requires us to presume the Commissioner's notices of deficiency are correct and places the burden on the taxpayer to prove otherwise.

[*20] See Welch v. Helvering, 290 U.S. 111, 115 (1933).  But this case is appealable to the Ninth Circuit, which requires that the Commissioner first show "some evidence * * * which would support an inference" of the taxpayer's involvement in the activity during the year at issue.  Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979) (quoting Gerado v. Commissioner, 552 F.2d 549, 554 (3d Cir. 1977)), rev'g 67 T.C. 672 (1977).  The Commissioner easily carries this burden, as Mr. Hommel has stipulated that he bought and sold gold and silver coins in 2009.  The Commissioner, therefore, has correctly attributed Mr. Hommel's unreported income to his businesses.[13]

A.     Bank Deposits Analysis

When a taxpayer does not keep adequate records of his income, the Commissioner may reconstruct it, see secs. 6001, 446(b), and may use a taxpayer's bank deposits to do so.  See Palmer v. IRS, 116 F.3d 1309, 1312 (9th Cir. 1997) (holding that the IRS may rationally reconstruct income where taxpayers fail to offer accurate records); Parks v. Commissioner, 94 T.C. 654, 658 (1990).  A bank-deposits analysis assumes that all money deposited in a taxpayer's bank accounts during a given period is taxable income, and unexplained deposits are considered

---

[13] Mr. Hommel also admitted that he failed to report the $336,000 Morgan Stanley distribution he received during 2009.  We therefore find that this amount is taxable income to Mr. Hommel.

**[\*21]** *prima facie* evidence of income.  See <u>United States v. Helina</u>, 549 F.2d 713, 715 n.2 (9th Cir. 1977); <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986).  The taxpayer then has the burden to show that such deposits were inheritances, loan proceeds, transfers from another personal account, or otherwise nontaxable.  See <u>Palmer</u>, 116 F.3d at 1312.  The Commissioner has to subtract reported income and income from nontaxable sources that he knows about.  <u>Helina</u>, 549 F.2d at 715 n.2.  If a taxpayer believes the Commissioner's computation is unfair or inaccurate, however, he has the burden to show how it's wrong.  <u>Palmer</u>, 116 F.3d at 1312.

We find that the Commissioner is allowed to use the bank-deposits analysis, because Mr. Hommel failed to provide books and records for his silver and gold businesses during the audit.  We also find that the Commissioner looked at all five of Mr. Hommel's available accounts and even had a second agent, Agent Shin, review the analysis.  Agent Shin's review was thorough--he looked at every deposit (e.g., wire transfers, cash deposits, cashier's checks) and found that Mr. Hommel's unreported gross receipts on his Schedule C were more than $1 million *less* than originally determined.  What's more, even though Mr. Hommel shared signatory authority on two accounts included in the analysis, most of the

**[\*22]** unreported income was found in his personal checking account and came mostly from precious metal sales that he himself had made.

Mr. Hommel argues the analysis is flawed. He describes in some detail the wrongs he suffered from his former Rocklin and J.H. Mint workers and what he calls the bad faith of the IRS. We do think Mr. Hommel's description of his grievances is sincere, but it just doesn't affect the merits of the Commissioner's analysis, because that analysis looked only at deposits made to Rocklin's account *before* the September 2009 change in ownership. It doesn't include anything MV did as Rocklin's purported owner.

And any theft from J.H. Mint is likewise irrelevant to the analysis. DB didn't have signatory authority for any of the accounts included in the analysis, and Mr. Hommel admitted that the only other mint worker who had such authority--Mr. Hronis--never stole from him. The Commissioner also agrees that most of the deposits made into the account that bore both Mr. Hommel's and Mr. Hronis's names were nontaxable wire transfers.

And that leads to the real problem here: Mr. Hommel argues that he can't owe a deficiency because he has no money to pay it. We understand that a taxpayer's financial circumstances when it comes time to pay can look much

[*23] different from the way they did in the tax year at issue. But a taxpayer's inability to pay does not mean he doesn't have a tax deficiency.[14]

Nor do we see bad faith in the way the Commissioner conducted his bank-deposits analysis; and if it turns out not to have been as accurate as it possibly could have been, the fault lies with Mr. Hommel's failures at recordkeeping. Restraining orders aside, Mr. Hommel should have been able to at least try to obtain records from Rocklin and J.H. Mint, if there were any. And he surely could have at least produced records for seekbullion.com--one of his businesses without any ownership dispute or restraining order in place. Had Mr. Hommel kept copies of records, he could have avoided the bank-deposits analysis altogether. But he didn't, and so we find that he underreported his 2009 Schedule C gross receipts by $6,810,339--as the Commissioner determined.

## B. COGS and More

Gross receipts aren't the same as taxable income. Everyone recognizes that Mr. Hommel had inventory costs and other expenses. The Commissioner didn't challenge the nearly $270,000 in business expenses that Mr. Hommel claimed on

---

[14] We urge the Commissioner to tell Mr. Hommel about collection alternatives at the end of this case.

[*24] his Schedule C. The Commissioner, however, does disagree with Mr. Hommel's reported adjustment for COGS and the theft loss that he claimed.

### 1. COGS

COGS is computed under section 471.[15] During the audit, the Commissioner measured Mr. Hommel's Schedule C, COGS adjustment. And in preparing for trial, the Commissioner increased it by more than $4 million after he reviewed all of Mr. Hommel's outgoing wire transfers. Yet Mr. Hommel still disagrees with this number because he believes that the Commissioner failed to take cash outlays to the public into account.

The problem here, as throughout much of the case, is that Mr. Hommel kept no records of any such cash transactions for Rocklin, J.H. Mint, or seekbullion.com.[16]

---

[15] COGS is the cost of acquiring inventory, through either purchase or production. See, e.g., Reading v. Commissioner, 70 T.C. 730, 733 (1978), aff'd, 614 F.2d 159 (8th Cir. 1980). No matter the line of business, taxpayers use COGS to offset their gross receipts when they calculate gross income. See, e.g., Olive v. Commissioner, 139 T.C. 19, 20 n.2 (2012), aff'd, 792 F.3d 1146 (9th Cir. 2015).

[16] It also seems likely that the Commissioner incorrectly included the cost of J.H. Mint's machinery in COGS, but neither party asks us to correct this error.

**[\*25]**     2.     <u>Theft Loss</u>

Mr. Hommel also argues that we should consider the thefts he suffered as we redetermine his 2009 tax bill. But the problem here is one of timing. The alleged thefts occurred and Mr. Hommel discovered them only in 2010. That's the year they would be deductible. <u>See</u> sec. 165(a), (e).

Mr. Hommel, however, argues less about the details of a theft-loss deduction under the Code, and more about how he shouldn't have to owe so much tax when he lost so much and had so many reversals of fortune. He argues that he shouldn't owe any tax at all when by his estimation he suffered an $800,000 loss. Had the Commissioner not determined that Mr. Hommel underreported his income and accepted his return as filed, this argument might be valid. But the Commissioner determined that Mr. Hommel had gross income in 2009 of millions more than he reported, which means that he did not end 2009 with a loss.

II.     <u>Penalties</u>

The Commissioner also wants a section 6651(a) addition to tax and a section 6662(a) accuracy-related penalty against Mr. Hommel for 2009. Mr. Hommel contests both of these by claiming, among other things, that the Commissioner is "barred by res judicata and collateral estoppel," because "the

**[\*26]** penalties pursuant to sections 6651 and 6662 were previously litigated and conceded by Respondent."[17]

We will first address res judicata and collateral estoppel.

A.     Res Judicata and Collateral Estoppel

The problem for Mr. Hommel here is that he wants us to use a stipulated decision from a *different* tax year to bar the Commissioner from determining an addition to tax and a penalty for his 2009 tax year.  This means his argument is really only about collateral estoppel, because res judicata is a different legal doctrine that doesn't apply unless there is a final judgment involving "the same claim and the *same* tax year."  Commissioner v. Sunnen, 333 U.S. 591, 598 (1948) (emphasis added); see also Baker v. IRS (In re Baker), 74 F.3d 906, 910 (9th Cir. 1996).

And collateral estoppel doesn't work here either, because it requires the parties to have litigated issues through to a final judgment.  The record for the

---

[17] Mr. Hommel has made a handful of other requests for affirmative relief including: $8 million in compensation from the IRS for his pain and suffering and for destroying his businesses, homes, and financial life, either in the form of, or in addition to, a full refund of all taxes he's ever paid; an order to abolish the IRS, disband it, and send home its employees, or alternatively, a restraining order to keep the IRS from ever auditing a return or assessing tax from him again; and a penalty of 10% to 100% of the IRS' budget to be assessed against it (and presumably paid to him).  We do not have jurisdiction to grant these claims for relief.  See sec. 7442; Wagstaff v. Commissioner, T.C. Memo. 2019-114, at \*5-\*6.

**[*27]** 2008 case contains nothing more than a petition, an answer, and a stipulated decision. Settlements generally don't collaterally estop parties from litigating the same issue again. See United States v. Intl. Bldg. Co., 345 U.S. 502, 506 (1953) (holding that there is no collateral estoppel from a stipulated decision); Warren Jones Co. v. Commissioner, 68 T.C. 837, 846 (1977) (holding that a stipulated computation does not give rise to collateral estoppel), aff'd, 617 F.2d 536 (9th Cir. 1980); Massaglia v. Commissioner, 33 T.C. 379, 386 (1959), aff'd, 286 F.2d 258 (10th Cir. 1961).

    B.    Section 6651(a)

With these defenses struck, we turn next to the addition to tax under section 6651(a)(1). This addition is 5% of the tax due if within the first month the return is late and "an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate." Id. The Commissioner has met his burden here with Mr. Hommel's 2009 tax return, which bears a filing date of October 5, 2011--over a year past its due date. To avoid this addition to tax, a taxpayer must prove that his failure to file was due to reasonable cause and not due to willful neglect. Id.; United States v. Boyle, 469 U.S. 241, 245 (1985). Mr. Hommel argues that he had reasonable cause since "this [penalty] was already waived because [he] went to rehab for alcohol in

**[\*28]** 2011," and because his alcoholism worsened after he discovered what was going on with his coin shops. We do not make light of Mr. Hommel's personal struggle, but we think the Commissioner correctly points out that Mr. Hommel did not discover the thefts until three months after the return's due date. We look at his condition when the return was due, so that even if Mr. Hommel's troubles might have been a reasonable cause for not filing, he didn't know he had them until after his 2009 return was due. What's more, Mr. Hommel himself said that he did not "accurately timely file [his] Form 1040 for tax year 2009" because "i[t] was late." We find that his return was late just because he didn't get it done in time.

Mr. Hommel, therefore, owes this addition to tax.

### C. Section 6662(a) Penalty

#### 1. The Basics

That leaves the 20% accuracy-related penalty that the Commissioner wants for substantial understatement of the tax due or for negligence or disregard of the rules or regulations. See sec. 6662(a) and (b)(1) and (2). The Code tells us that an understatement is substantial if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." Sec. 6662(d)(1)(A). The Commissioner easily meets this part of his burden because Mr. Hommel's

**[\*29]** understatement exceeded both 10 percent of the tax he was required to show and $5,000.

The regulations tell us that a taxpayer is negligent if he "fail[s] to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of [his] tax return." Sec. 1.6662-3(b)(1), Income Tax Regs. Negligence also includes "any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Id. The Commissioner also meets this part of his burden, because Mr. Hommel did not provide any records pertaining to his gold and silver dealings. Mr. Hommel argues that he was unable to obtain these records, but as we've already found, Mr. Hommel failed to provide any records of even those sales completed before ownership of Rocklin or J.H. Mint was in dispute. Mr. Hommel also never provided any records relating to his seekbullion.com internet sales. This allows us to find that he's failed to keep adequate books and records and signals loudly to us that he failed to "exercise ordinary and reasonable care."

Section 6664(c) provides an out for a taxpayer who can show that he had reasonable cause for the underpayment and acted in good faith. Good-faith reliance on a competent professional falls under section 6664(c)'s umbrella. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd,

**[*30]** 299 F.3d 221 (3d Cir. 2002). Mr. Hommel mentions that he used a return preparer, Mr. Ottinger, but to establish this defense he must prove:

- his return preparer was a competent professional who had sufficient expertise to justify reliance,

- he provided necessary and accurate information to his return preparer, and

- he actually relied in good faith on his preparer's advice in completing his return.

See id. at 99. We are unable to move beyond the first bullet point because we lack any information about Mr. Ottinger's expertise. Mr. Hommel urges us to look at Ottinger's website, which is just a Google search away, but googling is not a substitute for evidence at trial.

What's more, Mr. Hommel admitted that he didn't make his CPA aware of his distribution from Morgan Stanley because it "slipped [his] notice" and that he failed to provide Mr. Ottinger with any 2009 bank statements. Mr. Hommel was quite unsure what documentation he actually did provide to Mr. Ottinger. He therefore has not established that he reasonably relied on his tax preparer.

2. *Chai*ghoul

But section 6751(b)(1) tells us that the Commissioner cannot assess a section 6662(a) penalty unless it is "personally approved (in writing) by the

[*31] immediate supervisor of the individual making such determination." It's now well known that this provision means that the Commissioner cannot assert a penalty in a notice of deficiency or an amended answer without that approval, see Graev III, 149 T.C. at 493 (citing Chai v. Commissioner, 851 F.3d 190), unless the determination falls within section 6751(b)(2)'s exceptions, see Walquist v. Commissioner, 152 T.C. 61, 70 (2019). We also know that if there is no evidence in the record of an essential condition for the imposition of a penalty--such as this written supervisory approval--the party who has the burden of production loses.[18] See Wheeler v. Commissioner, 127 T.C. 200, 210-12 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008); Ford v. Commissioner, T.C. Memo. 2018-8, 115 T.C.M. (CCH) 1027, 1028 (2018), aff'd, 751 F. App'x 843 (6th Cir. 2018).

The Commissioner has the burden here, and at trial he didn't introduce evidence of supervisory approval. He did, however, move to reopen the record earlier this year to show that he complied with section 6751(b)(1). In support of his motion he lodged two declarations: one from John Yu to authenticate the penalty-approval form and show how Mr. Yu came to approve a penalty determination; and another from Revenue Agent David Strayer, who claims to

_____

[18] Mr. Hommel placed the section 6662 penalty at issue in his petition, which means the Commissioner has the burden of production. See Swain v. Commissioner, 118 T.C. 358, 364-65 (2002).

[*32] have been the revenue agent who performed the examination of Mr. Hommel's 2009 return.

Mr. Yu says in his declaration that he was Agent Strayer's immediate supervisor and that he approved the penalty determination in this capacity by signing the penalty-approval form. The form itself has no creation date, but it appears to have been signed by Mr. Yu on April 30, 2014--a date before the June 26, 2014 date of Mr. Hommel's notice of deficiency.

But there are some issues with the penalty-approval form: It lists a "Chase Cunningham" as the examiner of Mr. Hommel's return and bears no origination date. This is a problem for the Commissioner because it is the "initial determination" of a penalty that must be timely approved by the immediate supervisor "of the individual making such determination." Both Mr. Yu and Agent Strayer say in their declarations that this was a simple autopopulation issue that resulted from Cunningham's initial and short-lived involvement with the case; he was just the "agent who originally input this case into the Service's Report Generation Software" before the examination was reassigned to Agent Strayer.

To confirm this autopopulation error, Mr. Yu attached to his declaration an "Examining Officer's Activity Record" that he created. And though there is no origination date, the activity record bears handwritten notations, one dated

**[*33]** "12/20/13" that reads "Case assigned to David Strayer," and the other dated

"4/30/14" as the date when the penalty was approved. In his declaration Agent

Strayer confirms this reassignment and says he examined Mr. Hommel's return

and completed the penalty-approval form. Mr. Hommel objects to the

Commissioner's motion as untimely and says that allowing the record to be

reopened after the trial record was closed will prejudice him.

We use our discretion to decide whether to reopen the record for additional

evidence, Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331

(1971), but we won't do so unless the evidence a party seeks to add to the record is

not merely cumulative or impeaching, is material to the issues involved, and

would change the outcome of the case, Butler v. Commissioner, 114 T.C. 276, 287

(2000), abrogated on other grounds by Porter v. Commissioner, 132 T.C. 203

(2009). Even if the evidence is material and would change the outcome of the

case, we still need to weigh the Commissioner's diligence (or lack thereof) against

any possible prejudice to Mr. Hommel if we were to grant the motion to reopen the

record. See SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir. 1986) (citing Zenith

Radio Corp., 401 U.S. at 332), abrogated on other grounds by Pinter v. Dahl, 486

U.S. 622 (1988); Snuggery-Elvis P'ship v. Commissioner, T.C. Memo. 1992-622,

**[\*34]** 64 T.C.M. (CCH) 1128, 1132 (1992).  The Commissioner argues that he has met these criteria.

The Commissioner didn't introduce any evidence at trial that he'd complied with section 6751(b)(1), so we can't say that the penalty-approval form is merely cumulative or impeaching.  The penalty-approval form is material and if credible, would likely change the outcome of the case.  See Butler, 114 T.C. at 287; Shuman v. Commissioner, T.C. Memo. 2018-135, at \*25-\*26.  The penalty-approval form itself is also nonhearsay, see Fed. R. Evid. 801(c) advisory committee's note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."), and the Commissioner has also properly authenticated it, see Fed. R. Evid. 901(b)(7)(B) (stating the authentication requirement met by evidence that "a purported public record or statement is from the office where items of this kind are kept").

The mystery name on the approval form, however, calls into question whether Agent Strayer was in fact the individual who made the penalty determination and whether his report was even the initial determination.

In Palmolive v. Commissioner, 152 T.C. 75, 88 (2019), the taxpayer argued that the Commissioner hadn't proved exactly how or when the revenue agents

[*35] made their initial determinations to assert penalties. We disposed of this argument because "the subordinate employee[s] made [their] respective 'initial determination[s]' at the time [they] solicited [their] supervisor's approval." Id. We reasoned that to find otherwise would be "speculation" because "we kn[e]w of no other inference about the timing of the 'initial determination.'" Id. The dates when the revenue agents solicited their supervisor's approval were the dates on which the supervisor signed the penalty-approval forms. Id. at 79-81.

We also held in Palmolive that section 6751(b)(1) "does not require any particular writing by the individual making the penalty determination, nor any signature *or written name of the individual*." Id. at 86 (emphasis added). The penalty-approval form in Palmolive did not bear the name of the revenue agent who made the initial determination, or any name at all. Id. Palmolive is distinguishable, however, because the parties there stipulated the identity of the IRS employees involved. They didn't here.

This is a problem for the Commissioner. The only thing linking Agent Strayer to an immediate supervisor is his declaration swearing he indeed made the initial determination and got the written approval from his supervisor, Mr. Yu. This means that the Commissioner is trying to both introduce and undermine his own penalty-approval form. The problem here is that the form doesn't speak for

**[*36]** itself, and the declarations that the Commissioner seeks to have admitted are hearsay.  We think Mr. Hommel is correct when he argues that this means he would be prejudiced by their admission after trial and without any opportunity for cross-examination.

It is for this reason, and this reason alone, that Mr. Hommel is not liable for this accuracy-related penalty.

This is a split decision and concessions were made so,

<u>Decision will be entered under</u>

<u>Rule 155</u>.